**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**WESTERN DIVISION**

| | |
|---|---|
| GERALD L. WRIGHT, | No. CV 06-617-PLA |
| Plaintiff, | |
| v. | **MEMORANDUM OPINION AND ORDER** |
| JO ANNE B. BARNHART, COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION, | |
| Defendant. | |

**I.**

**PROCEEDINGS**

Plaintiff filed this action on February 6, 2006, seeking review of the Commissioner's denial of his application for Supplemental Security Income ("SSI") payments. The parties filed a Consent to proceed before the undersigned Magistrate Judge on October 4, 2006.  Pursuant to the Court's Order, the parties filed a Joint Stipulation on October 2, 2006, that addresses their positions concerning the disputed issues in the case.  The Court has taken the Joint Stipulation under submission without oral argument.

/

/

## II.

## BACKGROUND

Plaintiff was born on December 7, 1950. [Administrative Record ("AR") at 68, 80.] He has received his G.E.D., and has past work experience as a supermarket janitor. [AR at 73, 77.]

On February 3, 2003, plaintiff filed his current application for SSI payments, alleging that he has been unable to work since October 15, 2002, due to depression, liver dysfunction, high blood pressure, and diabetes. [AR at 68-70, 72-73, 90, 242-51.] After his application was denied initially and on reconsideration, plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). The hearing was held on January 31, 2005, at which time plaintiff appeared with counsel and testified on his own behalf.[1] [AR at 237-69.] A vocational expert and a medical expert also testified. [AR at 255-68.] On June 21, 2005, the ALJ determined that plaintiff was not disabled. [AR at 20-25.] When the Appeals Council denied review on December 6, 2005, the ALJ's decision became the final decision of the Commissioner. [AR at 4-6.]

## III.

## STANDARD OF REVIEW

Pursuant to 42 U.S.C. § 405(g), this Court has authority to review the Commissioner's decision to deny benefits. The decision will be disturbed only if it is not supported by substantial evidence or if it is based upon the application of improper legal standards. Moncada v. Chater, 60 F.3d 521, 523 (9th Cir. 1995); Drouin v. Sullivan, 966 F.2d 1255, 1257 (9th Cir. 1992).

In this context, the term "substantial evidence" means "more than a mere scintilla but less than a preponderance -- it is such relevant evidence that a reasonable mind might accept as adequate to support the conclusion." Moncada, 60 F.3d at 523; see also Drouin, 966 F.2d at 1257. When determining whether substantial evidence exists to support the Commissioner's decision, the Court examines the administrative record as a whole, considering adverse as well

---

[1] An initial hearing was held on October 18, 2004, following which plaintiff was sent for further evaluation. [AR at 270-75.]

as supporting evidence. Drouin, 966 F.2d at 1257; Hammock v. Bowen, 879 F.2d 498, 501 (9th Cir. 1989). Where the evidence is susceptible to more than one rational interpretation, the Court must defer to the decision of the Commissioner. Moncada, 60 F.3d at 523; Andrews v. Shalala, 53 F.3d 1035, 1039-40 (9th Cir. 1995); Drouin, 966 F.2d at 1258.

## IV.

## THE EVALUATION OF DISABILITY

Persons are "disabled" for purposes of receiving Social Security benefits if they are unable to engage in any substantial gainful activity owing to a physical or mental impairment that is expected to result in death or which has lasted or is expected to last for a continuous period of at least twelve months. 42 U.S.C. § 423(d)(1)(A); Drouin, 966 F.2d at 1257.

**A.  THE FIVE-STEP EVALUATION PROCESS**

The Commissioner (or ALJ) follows a five-step sequential evaluation process in assessing whether a claimant is disabled. 20 C.F.R. §§ 404.1520, 416.920; Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1995, as amended April 9, 1996). In the first step, the Commissioner must determine whether the claimant is currently engaged in substantial gainful activity; if so, the claimant is not disabled and the claim is denied. Id. If the claimant is not currently engaged in substantial gainful activity, the second step requires the Commissioner to determine whether the claimant has a "severe" impairment or combination of impairments significantly limiting his ability to do basic work activities; if not, a finding of nondisability is made and the claim is denied. Id. If the claimant has a "severe" impairment or combination of impairments, the third step requires the Commissioner to determine whether the impairment or combination of impairments meets or equals an impairment in the Listing of Impairments ("Listing") set forth at 20 C.F.R., Part 404, Subpart P, Appendix 1; if so, disability is conclusively presumed and benefits are awarded. Id. If the claimant's impairment or combination of impairments does not meet or equal an impairment in the Listing, the fourth step requires the Commissioner to determine whether the claimant has sufficient "residual functional capacity" to perform his past work; if so, the claimant is not disabled

and the claim is denied. Id. The claimant has the burden of proving that he is unable to perform past relevant work. Drouin, 966 F.2d at 1257. If the claimant meets this burden, a prima facie case of disability is established. The Commissioner then bears the burden of establishing that the claimant is not disabled, because he can perform other substantial gainful work available in the national economy. The determination of this issue comprises the fifth and final step in the sequential analysis. 20 C.F.R. §§ 404.1520, 416.920; Lester, 81 F.3d at 828 n.5; Drouin, 966 F.2d at 1257.

**B.   THE ALJ'S APPLICATION OF THE FIVE-STEP PROCESS**

In this case, at step one, the ALJ found that plaintiff had not engaged in any substantial gainful activity since the alleged onset date of the disability. [AR at 20, 24.] At step two, the ALJ concluded that plaintiff had "severe" impairments consisting of hypertension, hepatitis C, diabetes mellitus, and depression.[2] [AR at 21, 24.] At step three, the ALJ found that plaintiff's impairments did not meet or equal any impairment in the Listing. [AR at 24.] The ALJ further determined that plaintiff retained the residual functional capacity ("RFC")[3] to perform light work.[4] [AR at 25.] At step four, the ALJ concluded that plaintiff was not able to perform his past relevant work as a janitor. [AR at 24-25.] At step five, the ALJ found, using the Medical-Vocational Guidelines, that there were a significant number of jobs that plaintiff was capable of performing. [AR at 25.] Accordingly, the ALJ determined that plaintiff was not disabled at any time through the date of the decision. [AR at 20-25.]

/

---

[2]   The ALJ concludes, inconsistently, that plaintiff's depression is both a severe impairment [AR at 21] and is not severe. [AR at 23.]

[3]   Residual Functional Capacity is what a claimant can still do despite existing exertional and nonexertional limitations. Cooper v. Sullivan, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989).

[4]   Light work is defined as work involving "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds" and requiring "a good deal of walking or standing" or "sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. §§ 404.1567(b), 416.967(b).

# V.

# **THE ALJ'S DECISION**

Plaintiff contends that the ALJ: (1) improperly rejected the opinion of the treating psychiatrist; (2) failed to call a medical expert in light of plaintiff's argument that his condition met or equaled the Listing; and (3) improperly rejected plaintiff's subjective testimony concerning his physical limitations. Joint Stipulation ("Joint Stip.") at 3-4. As set forth below, the Court agrees with plaintiff that the ALJ erred in rejecting the treating psychiatrist's opinion, and remands the matter for further proceedings.

## A.    THE EVIDENCE

Dr. Melanie Vega, a psychiatrist at the Central City Mental Health Center ("CCMHC"), treated plaintiff from March 22, 2002, through April 5, 2004. [AR at 122-24, 214.] On March 22, 2002, Dr. Vega recorded plaintiff's psychiatric history which included an overdose on Thorazine in 1970 and being hospitalized in 1972. [AR at 123.] Throughout the course of treatment, Dr. Vega noted plaintiff's assertions that he was not depressed; was doing fine or pretty well; slept well with the use of Elavil; did not have suicidal ideation, delusions, or hallucinations; had some situational depression secondary to financial concerns; and, at times, cried for no apparent reason. [AR at 120-23, 178-80, 214-15.] Dr. Vega also observed that plaintiff had no friends and usually displayed a constricted affect, while occasionally showing a blunted affect. [AR at 120-123, 178-80, 214-15.]

On March 4, 2004, Dr. Vega completed a Mental Residual Functional Capacity ("MRFC") form. [AR at 185-88.] Accordingly to Dr. Vega, plaintiff was moderately limited in his ability to: accept instruction from or respond appropriately to criticism from supervisors or superiors; work in coordination with or in proximity to others without distracting them or exhibiting behavioral extremes; respond appropriately to co-workers or peers; relate to the general public and maintain socially appropriate behavior; perform and complete work tasks in a normal work day or work week at a consistent pace; work in cooperation with or in proximity to others without being distracted by them; carry through on instructions and complete tasks independently; respond appropriately to changes in the work setting; remember locations and workday procedures and

instructions; be aware of normal hazards and take necessary precautions; behave predictably, reliably, and in an emotionally stable manner; and maintain personal appearance and hygiene. [AR at 185-87.] In addition, Dr. Vega opined that plaintiff was markedly limited in his ability to: process subjective information accurately and use appropriate judgment; maintain attention and concentration for more than brief periods of time; perform at production levels expected by most employers; and tolerate customary work pressures. [AR at 186-87.]

On April 2, 2003, Dr. Eleanor Krimerman administered a consultative psychiatric examination. [AR at 127-29.] She noted plaintiff's assertion that he did not have a disability and was filing the Social Security benefits claim because he could not afford medication for his Hepatitis C. [AR at 127.] Dr. Krimerman also noted plaintiff's psychiatric history, which included a suicide attempt by overdosing on Thorazine[5]; hearing voices; drug abuse; and hospitalization in a unit for the "criminally insane" before being sent to prison for robbery and drug use. [Id.] However, plaintiff stated that these events occurred over twenty years ago, and that he did not currently have suicidal ideation, homicidal ideation, delusions, or hallucinations.[6] [Id.]

Dr. Krimerman's mental status examination revealed that plaintiff was alert, had adequate concentration, was cooperative, had no disorder of speech or motor behavior, had slightly blunted but appropriate affect, displayed euthymic to mildly depressed mood, was oriented in all respects, had a general fund of information consistent with his educational background, had good abstract thinking, had goal-directed thinking, had fair insight, and had fair to adequate motivation. [AR at 128-29.] Dr. Krimerman also reviewed the records from CCMHC, which indicated that plaintiff had a past history of depression and sadness, had poor sleep without medication, cried for no reason at times, and was socially withdrawn. [AR at 129.] Dr. Krimerman diagnosed plaintiff with "probable

---

[5]   Plaintiff stated that he was prescribed Thorazine because he was "acting erratic" and thought that people were "out to get [him]." [AR at 127.]

[6]   Plaintiff asserted to Dr. Krimerman that he attempted suicide during his teenage years and was hospitalized when he was about nineteen or twenty years old. [AR at 127.] In addition, plaintiff stated that he was using drugs when he experienced the psychotic symptoms. [Id.] He asserted that he has not heard voices in the past thirty years and has not used drugs in the past twenty years. [Id.]

[m]ajor [d]epression without psychotic features, mild to moderate in severity . . ., recurrent." [Id.] She noted that plaintiff's medication appeared helpful as "he is reasonably free from depression at this time." [Id.] She characterized plaintiff's ability to relate to others as withdrawn but appropriate, and opined that plaintiff's activities were "moderately to moderately severely restricted" and his interests were "moderately to moderately severely constricted." [Id.] Dr. Krimerman concluded that plaintiff's prognosis was guarded to fair, depending on whether he continued to receive treatment. [Id.]

On October 6, 2004, Dr. Christina Scott performed a psychological consultative examination by administering a Bender Gestalt Test ("Bender"), Wechsler Adult Intelligence Scale-Third Edition ("WAIS-III"), and Rorschach Inkblot Test ("Rorschach"). [AR at 228-30.] The results from the Bender indicated that plaintiff's visual-motor functioning was normal. [AR at 229.] Dr. Scott noted that plaintiff's responses to the Rorschach were conventional and not indicative of psychosis. [Id.] Additionally, the results from the WAIS-III revealed that plaintiff's reading ability was adequate for everyday purposes and his thinking was concrete. [Id.] However, the WAIS-III results also indicated that plaintiff's vocabulary, abstract reasoning ability, short-term memory for digit series, long-term memory for information, and social reasoning/judgment were slightly below average to average for his age group and his visual-motor problem-solving ability was slightly below average. [Id.] She diagnosed plaintiff with major depressive disorder, single episode, in remission, and assessed a Global Assessment of Functioning ("GAF") score of 48.[7] [AR 230.]

On November 18, 2004, Dr. Carlos Reinoso administered another psychological consultative examination, which included a WAIS-III and mental status examination. [AR at 220-22.] Specifically, the results from the WAIS-III indicated that plaintiff was functioning in the below average range of intelligence. [AR at 221.] The mental status examination revealed that plaintiff

---

[7] A GAF score is the clinician's judgment of the individual's overall level of functioning. It is rated with respect only to psychological, social, and occupational functioning, without regard to impairments in functioning due to physical or environmental limitations. See American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, 32 (4th ed. 2000) (hereinafter "DSM IV").  A GAF score of 41-50 denotes "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." DSM IV at 34.

exhibited appropriate thought processes; displayed no evidence of preoccupations, suicidal ideation, obsession, illusions, delusions, hallucinations or ideas of reference; was oriented in all domains; had normal fund of information; had normal short- and long-term memory; and had normal judgment and insight.[8] [Id.] However, plaintiff reported suffering from depression for the last 30 years, and indicated he had feelings of hopelessness, crying spells, and lack of stamina. [AR at 220-21.] Dr. Reinoso concluded that plaintiff demonstrated "adequate concentration, persistence and pace of response." [AR at 222.] He diagnosed plaintiff with major depressive disorder, by history, and recommended that plaintiff continue psychiatric treatment. [Id.]

Dr. Carlos Kronberger, a clinical psychologist, testified at the hearing on January 31, 2005. [AR 261-68.] Dr. Kronberger opined that, based on the medical records, plaintiff suffered from major depressive disorder. [AR at 262.] He further noted that plaintiff's testimony indicated that he had mild symptoms while on medication for the depression. [AR at 264.] However, when asked what the overall evidence indicated, Dr. Kronberger asserted that plaintiff's depression was in the "moderate range, but there [we]re a couple of areas where it might be marked at times as indicated by Dr. Vega." [AR at 265.]

### B. THE TREATING PHYSICIAN'S OPINION

Plaintiff contends that the ALJ erred in his consideration of the treating physician's opinion. Joint Stip. at 4.

In evaluating medical opinions, the case law and regulations distinguish among three types of physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (non-examining physicians). See 20 C.F.R. §§ 404.1502, 416.927; Lester, 81 F.3d at 830. Generally, the opinions of treating physicians are given greater weight than those of other physicians, because treating physicians are employed to cure and therefore have a greater opportunity to know and observe the claimant. Smolen v. Chater, 80 F.3d 1273, 1279 (9th Cir.

---

[8] Dr. Reinoso's findings that plaintiff had normal short-term memory, judgment, and insight were based on the results from the WAIS-III. [AR at 221.]

1996); Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989) (citing Sprague v. Bowen, 812 F.2d 1226, 1230 (9th Cir. 1987)). Although the treating physician's opinion is entitled to great deference, it is not necessarily conclusive as to the question of disability. Magallanes, 881 F.2d at 751 (citing Rodriguez v. Bowen, 876 F.2d 759, 761-62 (9th Cir. 1989)). Where the treating physician's opinion is uncontradicted, it may be rejected only for "clear and convincing" reasons. Lester, 81 F.3d at 830. Where the treating physician's opinion is contradicted, the ALJ may reject it in favor of a conflicting opinion of an examining physician if the ALJ makes findings setting forth specific, legitimate reasons for doing so that are based on substantial evidence in the record. Ramirez v. Shalala, 8 F.3d 1449, 1453-54 (9th Cir. 1993).

In the hearing decision, the ALJ rejected Dr. Vega's opinion, reasoning that Dr. Vega's assessments were "inconsistent with the progress notes, treatment, and evaluations set forth in the records received from CCMHC, including those written by Dr. Vega." [AR at 23.] The ALJ also noted that, although plaintiff sought treatment at CCMHC, "he repeatedly indicated that he was not depressed and only needed treatment for sleep assistance." [Id.] As the ALJ found that Dr. Vega's opinion was contrary to the weight of the medical evidence, the ALJ further reasoned that "[o]bviously [Dr. Vega] then was completing the [MRFC form] in an attempt to secure benefits for h[er] patient." [Id.]

The ALJ then noted that the consultative examinations performed by Drs. Krimerman, Scott, and Reinoso demonstrated that plaintiff's depression was not severe. [AR at 23.] The ALJ also summarized the testimony of Dr. Kronberger as an expert opinion that there was no evidence of disabling depression. [Id.] Although the ALJ initially found that plaintiff's depression is a severe impairment [AR at 21], he later concluded that plaintiff's depression was not severe. [AR at 23.] He reasoned that the "objective reports by Dr. Scott [and] Dr. Reinoso, and the relatively normal daily activities performed by [plaintiff] must be given more weight than to the report [b]y Dr. Vega[.]"[9] [Id.]

---

[9] Although the ALJ did not expressly state that the report from Dr. Krimerman must also be given more weight, it appears that the ALJ did so, as Dr. Krimerman's opinion was summarized, along with the opinions of Drs. Scott and Reinoso, for the proposition that plaintiff did not have

The ALJ failed to provide legally sufficient reasons for rejecting Dr. Vega's opinion. In determining that Dr. Vega's findings of moderate to occasionally marked limitations were inconsistent with the records from CCMHC, the ALJ correctly noted that the treatment notes reflected that plaintiff was doing fine or pretty well; he was not depressed; he was sleeping well with the use of Elavil; his thoughts were logical and goal-directed; he did not have suicidal ideation, delusions, hallucinations, or referential thinking; and he had some situational depression secondary to financial concerns. [AR at 23, 120-23, 178-80, 213-15.] However, the ALJ failed to consider observations made by Dr. Vega which supported her assessments. In particular, Dr. Vega noted numerous times that plaintiff was socially withdrawn.[10] [AR at 122, 180, 214-15.] These observations are consistent with Dr. Vega's findings that plaintiff had moderate limitations in his functional abilities related to social interaction (i.e., ability to accept instruction from or respond appropriately to criticism from supervisors or superiors, work in coordination with or in proximity to others without distracting them or exhibiting behavioral extremes, respond appropriately to co-workers or peers, and relate to general public and maintain socially appropriate behavior). The ALJ also failed to consider Dr. Vega's observations that, at times, plaintiff experienced crying spells and displayed a blunted affect.[11] [AR at 122, 180, 214-215.] These symptoms could translate to significant limitations in plaintiff's ability to respond to people and work situations.

The ALJ's failure to explain why these findings did not support Dr. Vega's assessments constitutes error. See Embrey v. Bowen, 849 F.2d 418, 421-23 (9th Cir. 1988) ("To say that medical opinions are not supported by sufficient objective findings or are contrary to the preponderant conclusions mandated by the objective findings does not achieve the level of

---

severe depression. [AR at 23.]

[10] On March 22, 2002, Dr. Vega noted that plaintiff mostly stayed at home. [AR at 122.] On May 1, 2003, Dr. Vega recorded that plaintiff had no friends. [AR at 180.] On March 4, 2004, and April 5, 2004, plaintiff indicated that he isolated himself. [AR at 214-15.]

[11] On April 3, 2003, and April 5, 2004, Dr. Vega noted that plaintiff displayed a blunted affect. [AR at 180, 214.] During the other sessions, Dr. Vega observed that plaintiff displayed a constricted affect. [AR at 120-21, 123, 178-80, 215.]

specificity our prior cases have required, even when the objective factors are listed seriatim. The ALJ must do more than offer his conclusions. He must set forth his own interpretations and explain why they, rather than the doctors', are correct." (footnote omitted)). Thus, to conclude that Dr. Vega's assessments were inconsistent with her treatment notes was not supported by substantial evidence in the record.

In addition, the ALJ erred in suggesting that, given the inconsistency between Dr. Vega's opinion and her treatment notes, her report was "obviously" completed "in an attempt to secure benefits for h[er] patient." As Dr. Vega provided medical bases for her opinion, the ALJ could have rejected Dr. Vega's findings based on her professional relationship with plaintiff only by showing evidence of actual impropriety. See Nguyen v. Chater, 100 F.3d 1462, 1465 (9th Cir. 1996) (the source of report is a factor that justifies rejection only if there is evidence of actual impropriety or no medical basis for opinion) (citing Saelee v. Chater, 94 F.3d 520, 523 (9th Cir. 1996), cert. denied, 519 U.S. 1113 (1997)). The record contains no evidence indicating that Dr. Vega embellished her assessments of plaintiff's limitations in order to assist him with his SSI claim.[12] Accordingly, this suggestion does not constitute a specific, legitimate reason for rejection. See Reddick v. Chater, 157 F.3d 715, 725-26 (9th Cir. 1998) (holding that the ALJ erred in assuming that the treating physician's opinion was less credible, because his job was to be supportive of the patient).

Neither does the ALJ account for the subjective assessment of Dr. Vega. "The subjective judgments of treating physicians are important, and properly play a part in . . . medical evaluations.

---

[12] Plaintiff also argues that his assertions that he was not depressed could not be used as a reason for rejecting Dr. Vega's opinion. Joint Stip. at 8. He contends that the ALJ "sets forth no support for [the] proposition that a claimant for benefits who is untrained in psychiatry has the ability to diagnose his or her disorder." Id. It appears that the ALJ cited plaintiff's assertions of not being depressed as part of his explanation of why Dr. Vega's opinion was inconsistent with her treatment notes. [AR at 23.] However, to the extent that this was a separate reason for rejection, plaintiff's argument is unavailing. The ALJ did not use plaintiff's assertions for diagnostic purposes, but rather to show that Dr. Vega could not have found plaintiff to have mental limitations after considering plaintiff's contradictory assertions. Nevertheless, the ALJ's other reasons to reject Dr. Vega's opinion were not legitimate. In addition, as will be discussed below, the ALJ's reliance on the consultative examiners' opinions was not supported by substantial evidence in the record.

Accordingly, the ultimate conclusions of these physicians must be given substantial weight." Embrey, 849 F.2d at 422. This is especially true given the duration of Dr. Vega's treating relationship with plaintiff, which began on March 22, 2002, and ended on April 5, 2004, for a total of approximately twelve sessions over two years. [AR at 120-24, 178-80, 214-15.] Given Dr. Vega's extensive treating relationship with plaintiff, her findings were entitled to greater consideration. 20 C.F.R. §§ 404.1527(d)(2)(i), (ii), 416.927(d)(2)(i), (ii) (weight accorded to a treating physician's opinion dependent on length of the treatment relationship, frequency of visits, and nature and extent of treatment received).

Even assuming that the ALJ had provided specific and legitimate reasons for rejecting Dr. Vega's opinion, the ALJ's finding that plaintiff's depression is not severe was not supported by substantial evidence in the record.[13] First, the ALJ's conclusions in the decision in this regard are contradictory. Second, in determining that plaintiff had nonsevere depression, the ALJ relied on the opinions of consultative examiners and a medical expert. However, the ALJ incorrectly noted that Drs. Krimerman, Scott, and Kronberger found that plaintiff had nonsevere depression. [AR at 23.] Instead, although Dr. Krimerman opined that plaintiff was "reasonably free from depression at this time," she also assessed plaintiff's activities to be "moderately to moderately severely restricted" and his interests to be "moderately to moderately severely constricted." [AR at 129.] At best, Dr. Krimerman's opinion is unclear as to whether plaintiff suffered from severe depression.

In addition, Dr. Scott diagnosed plaintiff with a major depressive disorder, single episode, in remission, and assessed a GAF score of 48, which is indicative of a "serious" impairment in social and occupational functioning. [AR at 230.] The ALJ failed to consider Dr. Scott's GAF

---

[13] "An impairment or combination of impairments can be found 'not severe' only if the evidence establishes a slight abnormality that has 'no more than a minimal effect on [a claimant's] ability to work.'" Smolen, 80 F.3d at 1290 (citing Social Security Ruling 85-28 and Yuckert v. Bowen, 841 F.2d 303, 306 (9th Cir. 1988)); 20 C.F.R. § 416.921(a) ("An impairment or combination of impairments is not severe if it does not significantly limit [the claimant's] physical or mental ability to do basic work activities."). The "severity" requirement is merely "a *de minimis* screening device to dispose of groundless claims." Edlund v. Massanari, 253 F.3d 1152, 1158 (9th Cir. 2001) (citing Smolen, 80 F.3d at 1290).

assessment and simply concluded that, because plaintiff's major depressive disorder was in remission, his depression was not severe. But while a GAF score may not have a "direct correlation" to the Social Security severity requirements (see Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury, 65 F.R. § 50746-01 (Aug. 21, 2000)), the Court is aware of no authority asserting that the GAF score and its implications may be ignored and rejected without comment, as was done here. Even if it is not directly translatable into Social Security terminology, the score is still probative of plaintiff's condition. See, e.g., Escardille v. Barnhart, 2003 WL 21499999, *5-6 (E.D. Pa. June 24, 2003) (remanding based in part on ALJ's failure to address a GAF score of 50 "or its meaning regarding plaintiff's ability to maintain employment."). Here, the ALJ's selective reliance on only portions of the reports from Drs. Krimerman and Scott does not constitute substantial evidence. See Reddick, 157 F.3d at 723 (it is impermissible for the ALJ to develop an evidentiary basis by "not fully accounting for the context of materials or all parts of the testimony and reports"); Gallant v. Heckler, 753 F.2d 1450, 1456 (9th Cir. 1984) (an ALJ may not reach a conclusion and justify it by ignoring competent evidence in the record that would suggest an opposite result).

The ALJ's reliance on Dr. Kronberger's testimony was similarly misplaced. Dr. Kronberger testified at the hearing that the overall evidence indicated that plaintiff's depression was in the "moderate range, but there [were] a couple of areas where it might be [in the] marked [range] as indicated by Dr. Vega." [AR at 265.] The ALJ failed to properly consider Dr. Kronberger's findings and explain the weight given to his opinion.[14] See 20 C.F.R. §§ 404.1527(f)(2)(i), 416.927(f)(2)(i) (ALJs must consider findings of State agency medical and psychological consultants or other program physicians or psychologists as opinion evidence, and must explain the weight given to their opinions).

Among the mental health consultative examiners, only Dr. Reinoso appears to have opined that plaintiff had nonsevere depression. Specifically, Dr. Reinoso found that plaintiff demonstrated

---

[14] Although the ALJ did not expressly state that he adopted Dr. Kronberger's opinion, the ALJ was still required to explain the weight given to his opinion. See 20 C.F.R. §§ 404.1527(f)(2)(i), 416.927(f)(2)(i).

"adequate concentration, persistence and pace of response."[15] [AR at 222.] Nevertheless, the ALJ failed to note the discrepancies among the consultative opinions and provide reasons for adopting Dr. Reinoso's opinion and rejecting contradicting opinions. Accordingly, the ALJ's finding that plaintiff's depression was not severe was not supported by substantial evidence in the record.

## VI.

## REMAND FOR FURTHER PROCEEDINGS

As a general rule, remand is warranted where additional administrative proceedings could remedy defects in the Commissioner's decision. See Harman v. Apfel, 211 F.3d 1172, 1179 (9th Cir.), cert. denied, 531 U.S. 1038 (2000); Kail v. Heckler, 722 F.2d 1496, 1497 (9th Cir. 1984). In this case, remand is appropriate to determine if specific and legitimate reasons exist to disregard the disability opinions of Dr. Vega, and to analyze the severity of plaintiff's mental impairment. The ALJ is instructed to take whatever further action is deemed appropriate and consistent with this decision.[16]

Accordingly, **IT IS HEREBY ORDERED** that: (1) plaintiff's request for remand is **granted**; (2) the decision of the Commissioner is **reversed**; and (3) this action is **remanded** to defendant for further proceedings consistent with this Memorandum Opinion.

DATED: November 16, 2006

/S/
PAUL L. ABRAMS
UNITED STATES MAGISTRATE JUDGE

---

[15] However, Dr. Reinoso determined that plaintiff was functioning in the "Below Average" range of intelligence. [AR at 222.]

[16] As remand on this issue may impact on plaintiff's other claims, the Court will not address plaintiff's other arguments herein.